IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | :     Criminal No. 15-1 |
| DMITRIJ HARDER | : |

**GOVERNMENT'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW FOLLOWING A HEARING ON
<u>DEFENDANT'S MOTION TO SUPPRESS</u>**

The United States of America, by and through its undersigned attorneys, respectfully submits the following Proposed Findings of Fact and Conclusions of Law, in accordance with the Court's direction at the conclusion of the evidentiary hearing on the defendant's motion.

**I.  INTRODUCTION**

On January 6, 2015, a federal grand jury returned a fourteen-count Indictment charging the defendant with substantive violations of, and conspiracy to violate, the Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. § 78dd-1 <u>et seq</u>., ("FCPA") and the Travel Act, 18 U.S.C. § 1952, as well as with international promotional money laundering in violation of 18 U.S.C. § 1956(a)(2)(A), and conspiracy to commit international promotional money laundering in violation of 18 U.S.C. § 1956(h).[1] The defendant filed a motion to suppress statements he made to law enforcement agents during an interview in the secondary customs inspection area at John F. Kennedy International Airport ("JFK") on February 26, 2010.

On December 10, 2015, this Court conducted an evidentiary hearing on the defendant's motion. During the evidentiary hearing, the government presented the testimony of Special

---

[1] On December 15, 2015, the Grand Jury returned a Superseding Indictment against the defendant. (DE 62.) The Superseding Indictment altered language in some counts but did not alter the numbering of any counts, nor the offenses charged in them.

Agent Michael DiCaprio of the Federal Bureau of Investigation ("FBI") (DE 74 at 8:1–77:2) and retired Special Agent Peter Angelino of what was, in 2010, called the Department of Homeland Security's Immigrations and Customs Enforcement ("ICE") (id. at 78:16–90:25). The defendant presented the testimony of his wife, Sophia Moskalenko (id. at 95:2–101:5), and of Officer Hermanio Segui of the Customs and Border Protection Agency ("CBP") (id. at 102:1–107:11). The parties also introduced a number of exhibits, and a joint stipulation regarding the testimony that Port Authority Detective Shawn Russell would have given had he been called to the stand. (Id. at 107:13–108:11.) At the conclusion of the hearing, the Court directed the parties to submit proposed findings of fact and conclusions of law. (Id. at 108:18–109:4.)

Based on the testimony and evidence presented at the evidentiary hearing, and on the argument and authority presented in its opposition to the defendant's motion, the government respectfully urges the Court to deny the defendant's motion to suppress the defendant's statements to law enforcement during the February 26, 2010, interview based on the following proposed findings of fact and conclusions of law.

## II.     PROPOSED FINDINGS OF FACT

The Court makes the following findings of fact:

1.      The Court finds the testimony of all witnesses presented by both parties—i.e., FBI Special Agent DiCaprio, retired ICE Special Agent Angelino, CBP Officer Segui, and Ms. Moskalenko—credible and accepts their testimony as fact. Similarly, the Court finds the proffered testimony of Detective Russell in the parties' stipulation credible and accept it as fact.

2.      The defendant is a United States legal permanent resident. (Def. Ex. 2 at 1 (FBI-302 memorializing the February 26, 2010, interview of the defendant).)

3. On February 26, 2010, the defendant flew into JFK on a flight from Moscow, Russia. (Id. at 1.) The flight arrived at the gate at approximately 5:28 p.m. (DE 74 at 92:18-21.) The defendant then deplaned, waited in line, and presented himself to a primary inspection CBP officer. (Id. at 10:6-15.)

4. At the primary inspection point, the defendant was referred for a secondary examination, and was escorted to a waiting room in the secondary inspections area. (Id. at 10:16-20.) When escorted, the defendant was not physically restrained. (Id. at 10:23-25.) The waiting room is a large open area with seating around the perimeter. (Id. at 12:8-13.)

5. CBP officers then called the defendant's name, and he was escorted to an interview room. (Id. at 12:23-13:6.) As before, the defendant was not physically restrained when escorted. (Id. at 13:7-9.)

6. The room into which the defendant was escorted was approximately 12' x 12' in size and had a large window opening in a wall that faced a hallway. (Id. at 18:18-22; 19:4-11.) The opening allowed the occupants of the room to see out into the hallway, which was a high-traffic area. (Id. at 20:8-15.) The opening had a countertop at its lowest edge, on which a copy machine and fax machine sat. (Id. at 19:4-12.) The room did not have a handcuff bar or any other way to restrain an individual. (Id. at 20:2-4.)

7. Three law enforcement agents—Special Agents DiCaprio and Angelino and Detective Russell—met the defendant there. (Id. at 20:17-20.) Each agent was in plainclothes, and none displayed visible weapons. (Id. at 21:11-23.) The defendant sat closest to the door and the door remained open throughout the interview. (Id. at 20:21-21:9, 20:5-12, 27:23-28:9.) Special Agents DiCaprio and Angelino sat across a desk from the defendant, while Detective Russell leaned on the countertop in the large window opening. (Id. at 21:5-9.) A CBP officer—

3

Officer Segui—was also in and out of the room but did not participate in the interview. (Id. at 22:10-23.) Officer Segui was in uniform and had an exposed firearm. (Id. at 21:24-22:1.)

8. The agents advised the defendant of their identity and the purpose of the interview, explained to him that they would like to ask him a few questions, and asked if he would take the time to speak with them. (Id. at 23:1-16.) At no time did the agents tell the defendant he was under arrest or not free to leave. (Id. at 23:21-23.) At no time did the agents restrain the defendant in any way. (Id. at 23:24-24-2.) The agents do not administer Miranda warnings in this type of interview, and did not do so here. (Id. at 23:17-20, 51:10-19, 81:6-13.)

9. Special Agents DiCaprio and Angelino asked questions of the defendant for approximately two hours. (Id. at 26:1-3.) The questions related to a criminal investigation into whether the defendant had made corrupt payments to an official at the European Bank for Reconstruction and Development ("EBRD"). (Def. Ex. 2 at 3-6.) That investigation was led by an FBI special agent in the Philadelphia field office, and the agents interviewing the defendant had not been previously involved in the investigation. (DE 74 at 9:10-15, 41:2-14.) They asked the defendant a list of questions that had been prepared by others and provided to Special Agent DiCaprio at or around 6:00 p.m. on the evening of February 26, 2010. (Def. Ex. 1 (the email containing the list of questions); DE 74 at 38:18-23.) As the defendant answered their questions, the agents had no view about whether he had violated the FCPA or committed any other crime. (DE 74 at 25:1-5.)

10. The interview was a "gentleman's interview" throughout which the defendant was cooperative and friendly and the agents neither raised their voices nor employed any coercive tactics. (Id. at 24:3-11, 24:16-25, 68:25-69:13.) Though they do not recall whether the defendant made a request during the interview for water or to make a phone call, the agents who

4

interviewed him do not recall ever having denied such requests. (Id. at 25:13-25, 68:25-69:13, 84:9-17.)

11. The defendant voluntarily answered the agents' questions. (Id. at 24:3-19.) Toward the end of the interview, the defendant said he was willing to be contacted in the future. (Id. at 27:13-21.) At the end of the interview, the defendant accepted service of grand jury subpoenas from the agents in his capacity as the custodian of records for his company, and then departed. (Id. at 47: 12-16, Def. Ex. 2 at 6.)

### III. PROPOSED CONCLUSIONS OF LAW

The Court reaches the following conclusions of law:

#### A. Applicable Standards

1. To protect a suspect's Fifth Amendment right against self-incrimination, Miranda warnings are required before he is subjected to "custodial interrogation." Miranda v. Arizona, 384 U.S. 436, 444 (1966); see also Illinois v. Perkins, 496 U.S. 292, 297-98 (1990) ("It is the premise of Miranda that the danger of coercion results from the interaction of custody and official interrogation.").

2. An interrogation refers "to any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 300 (1980).

3. Determining whether an interview is an "interrogation" is only the first step of the Miranda inquiry, because agents "are not required to administer Miranda warnings to everyone whom they question." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). For Miranda warnings to be required, the interview must also be "custodial."

4.      "'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion . . . ." Howes v. Fields, 132 S. Ct. 1181, 1189 (2012).  "'Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" Yarborough v. Alvarado, 541 U.S. 652, 662 (2004) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)).  The test is an objective one, Stansbury v. California, 511 U.S. 318, 323 (1994) (per curiam) ("[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."), and is applied from the perspective of a reasonable innocent person, Florida v. Bostick, 501 U.S. 429, 437–38 (1991); see also  United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) ("Whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant.").

5.      An agent's subjective intent, suspicions, or views are irrelevant in determining custody.  Stansbury, 511 U.S. at 324 ("It is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear on the question whether the individual requires Miranda warnings"); see also Moran v. Burbine, 475 U.S. 412, 423 (1986) ("[T]he state of mind of the police is irrelevant . . . .").

6.      While courts have formulated a variety of differently-worded tests for determining whether a person is in custody,[2] the Supreme Court has "reemphasized that 'the

---

[2] The Third Circuit has noted that there are "at least three differently worded tests for when a person is in custody: (1) when the person has been deprived of her or his freedom in some significant way; (2) when a reasonable person would perceive that she or he was not at liberty to terminate the interrogation and leave; and (3) when there is a restraint on the person's freedom of movement of the degree associated with a formal arrest." United States v. Jacobs, 431 F.3d 99, 105 (3d Cir. 2005).

ultimate inquiry is simply whether there is a formal arrest or restraint of movement of the degree associated with a formal arrest.'" Yarborough, 541 U.S. at 662 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)); see also id. ("'Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'") (quoting Thompson, 516 U.S. at 113). A formal arrest is not necessary for a finding of custody, but if no arrest is made, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so." United States v. Willaman, 437 F.3d 354, 359 (3d Cir. 2006) (citation and quotation omitted).

7. The Third Circuit has identified five features of an interview courts should weigh when determining if a person was in custody:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

United States v. King, 604 F.3d 125, 138 (3d Cir. 2010) (finding interview was non-custodial and affirming denial of motion to suppress statement) (quoting Willaman, 437 F.3d at 359-60). More recently, the Supreme Court has identified factors relevant to the "custody" analysis that largely overlap with those identified by the Third Circuit: "the location of the questioning, its duration, statements made [by law enforcement] during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." Howes, 132 S. Ct. at 1189 (citations omitted).

8.      Not all questioning of an individual by a government employee—even questioning that may elicit an incriminating response—requires either the administration of <u>Miranda</u> warnings or even an analysis of whether the individual is subject to custodial interrogation within the meaning of <u>Miranda</u>.  For example, courts have treated booking questions, <u>see</u> <u>Penn. v. Muniz</u>, 496 U.S. 582, 601-02 (1990) (routine booking questions "reasonably related to the police's administrative concerns" are not covered by <u>Miranda</u>), and questions related to processing someone for deportation, <u>Bruce v. United States</u>, 439 F. Supp. 2d 364, 371-72 (M.D. Pa. 2006), as being wholly removed "from the ambit of <u>Miranda</u>," <u>id.</u> at 372.

9.      Similarly, in <u>United States v. Kiam</u>, 432 F.3d 524 (3d Cir. 2006), the Third Circuit held that government officers may pose admissibility-related questions to those seeking entry at our borders without considering whether <u>Miranda</u> applies.  An alien at the border bears an "information production burden," <u>id.</u> at 530, such that he or she "must convince a border inspector of his or her admissibility to the country by affirmative evidence," <u>id</u>. at 529 (citing 8 C.F.R. § 235.1(d)(1)).  Thus, "[a] person seeking entry into the United States does <u>not</u> have a right to remain silent; the immigrant must honestly describe his identity, nationality, business, and claim of entitlement to enter, and must do this without the aid of counsel."  <u>United States v. Gupta</u>, 183 F.3d 615, 617 (7th Cir. 1999).

10.     Accordingly, the Third Circuit in <u>Kiam</u> "reaffirm[ed] the well-established authority of border inspectors to ask questions of those entering the United States" without requiring an analysis of whether the questioning constitutes custodial interrogation under <u>Miranda</u>. <u>Id.</u>  This carve-out of admissibility-related questioning from the ordinary <u>Miranda</u> analysis applies even if that questioning overlaps with questioning related to criminal activity. <u>Id.</u> at 530 n.6 ("[T]he mere overlap of the admissibility questioning with the elements of [the

8

defendant's] criminal liability is not fatal."). And the carve-out applies to admissibility-related questioning regardless of an officer's subjective belief about an individual's engagement in criminal activity. Id. at 531 ("Suspicion of criminal activity cannot overrule the simultaneous responsibility of immigration or customs agents to inspect entrants at our borders.").

11. In Kiam, the Third Circuit held that the outer boundary of its admissibility-related questioning carve-out is reached when "the inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead further only a potential criminal prosecution . . . ." Id. at 530. After that point, "Miranda may then apply." Id.

12. Because the Third Circuit in Kiam found that the questioning at issue fell within the admissibility-related carve-out it had recognized, it did not have occasion to opine on when other questioning in a customs inspection area that related to a criminal investigation, such as the majority of the questions posed here, may require the administration of Miranda warnings. Indeed, Kiam is silent about the treatment of such questioning. The Court rejects the defendant's contention that Kiam stands for the proposition that any questioning at the border is per se custodial under Miranda and thus requires the administration of warnings unless the questioning is admissibility-related. Kiam itself cited with approval a First Circuit case that had rejected just such a per se approach to applying Miranda at the border. See Kiam, 432 F.3d at 528, fn.3 (citing United States v. Ventura, 85 F.3d 708, 712 (1st Cir. 1996), and noting that it "reject[ed] the District Court's conclusion that travelers were per se in custody for Miranda purposes because they 'may not simply walk away from an interrogating officer'"). Reading Kiam to mean that border searches are per se custodial would be inconsistent with the Miranda jurisprudence of the Supreme Court, the Third Circuit, and all of its sister circuits—all of which require a case-by-case, totality of the circumstances analysis and reject per se rules.

### B.  The February 26, 2010, Interview was an Interrogation

13.  As the government concedes, the defendant was subject to "interrogation" within the meaning of <u>Miranda</u> during his interview on February 26, 2010.  The agents asked questions about the defendant's conduct that underlies some of the charges in the Superseding Indictment.  While the agents who questioned the defendant did not know whether his responses were incriminating—indeed, they knew little about the case beyond the list of questions they were tasked with asking the defendant—those questions were reasonably likely to elicit an incriminating response, and therefore constitute interrogation under <u>Miranda</u>.

### C.  The Defendant was Not in Custody during the February 26, 2010, Interview

14.  Applying the factors set forth above, however, the Court finds that the February 26, 2010, interview of the defendant was not custodial.

15.  <u>What the Agents Told the Defendant</u>.  First, the statements that the agents made to the defendant at the outset of the interview weigh in favor of a finding that the interview was noncustodial.  The agents advised the defendant of their identity and the purpose of the interview, explained to him that they would like to ask him a few questions, and asked if he would take the time to speak with them.  At no time did the agents tell the defendant he was under arrest or not free to leave.  This factor therefore weighs in favor of finding that his interview was non-custodial.  See <u>United States v. Leese</u>, 176 F.3d 740, 744-45 (3d Cir.1999) (finding questioning not custodial where there was no record evidence that the agents told the suspect that she was required to speak with them).

16.  <u>The Location of the Interview</u>.  Second, the location of the interrogation weighs in favor of finding the interview non-custodial.  The interview occurred in a relatively large room with a large window-like opening to a hallway with heavy foot traffic.  The door to the room was

10

open, and the defendant was positioned closest to that door with no agents blocking his potential egress.

17.     As discussed above, the fact that the interview room was within a customs screening area does not, by itself, render the interview per se custodial.  In fact, courts have recognized that, as a practical matter, questioning at the border is less likely to be custodial than questioning in other settings, because people passing through borders expect questioning and delay.  See, e.g., United States v. FNU LNU, 653 F.3d 144, 153-54 (2d Cir. 2011) ("[I]n the context of arriving at an American airport, (a) in which compulsory questioning—with no freedom to enter the United States and with nowhere else to go—inheres in the situation and (b) in which the traveler has voluntarily submitted to some degree of confinement and restraint by approaching the border, a reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on. That one expects both constraints and questions—and that, at least initially, every traveler in the airport must submit to the same sort of questioning while not free to leave—reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest."); Moya, 74 F.3d at 1120 ("We stress that events which might be enough often to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into the country.").

18.     Multiple cases have applied the ordinary analysis of "custody" required by Miranda—i.e., the totality of the circumstances test—to hold that interviews conducted in the exact same customs screening area at JFK where agents questioned the defendant were non-custodial.  See, e.g., United States v. Broughton, 600 Fed. Appx. 780, 782-83 (2d Cir. 2015) (unpublished); FNU LNU, 653 F.3d at 152-55; United States v. Wilson, -- F. Supp. 3d --, No.

11

14–CR–0346 (MKB), 2015 WL 1876180, at *8-11 (E.D.N.Y. April 24, 2015); and United States v. Rijo-Carrion, No. 11–CR–784 (RRM), 2012 WL 6617388, at *2-4 (E.D.N.Y. December 19, 2012); but see United States v. Carr, 63 F. Supp. 3d 226, 236 (E.D.N.Y. 2014) (finding defendant was in custody when led by officers with hands on both of his arms to a "pat down" room, where he was accompanied by four officers).[3]

19. Cases holding that an interview within a prison is not necessarily custodial further foreclose the possibility of a per se rule that an interviewee's mere presence in a customs inspection area renders his interview "custodial" under Miranda. Prison inmates, obviously, are not free to come or go as they please, and invariably find themselves in more restrictive, coercive, and intimidating surroundings than those presented in the typical customs inspection area. Nevertheless, courts have rejected a per se rule that agents must Mirandize an inmate before questioning him in prison, instead requiring the same "totality of the circumstances"

---

[3] Numerous cases have similarly found questioning to be non-custodial in screening areas at other borders or their functional equivalents. See, e.g., United States v. Carter, 516 Fed. Appx. 344, at *2 (5th Cir. 2013) (unpublished) (Mexican border); United States v. Bengivenga, 845 F.2d 593, 596-600 (5th Cir. 1988) (en banc) (Mexican border); United States v. Galloway, 316 F.3d 624, 628-32 (6th Cir. 2003) (Cincinnati airport); United States v. Gonzalez, 448 Fed. Appx. 714, 715-16 (9th Cir. 2011) (unpublished) (Mexican border); United States v. Medina-Villa, 567 F.3d 507, 518-20 (9th Cir. 2009) (Mexican border; questioning held to be non-custodial even when officer approached defendant's car with gun drawn); United States v. Manta-Carillo, 491 Fed. Appx. 125, 128 (11th Cir. 2012) (unpublished) (Alabama port); United States v. Munoz-Gutierrez, 259 Fed. Appx. 197, 200 (11th Cir. 2007) (unpublished) (Miami airport); United States v. Medina, 167 Fed. Appx. 161, 166-67 (11th Cir. 2006) (unpublished) (same); Moya, 74 F.3d at 119-20 (11th Cir. 1996) (same); United States v. Costoso, 56 F. Supp. 3d 104, 111-12 (D.P.R. 2014) (Puerto Rico airport); United States v. Ibrahim, 998 F. Supp. 2d 12, 15-17 (N.D.N.Y. 2014) (Canadian border); United States v. Charles, No. 1:09–CR–386–TWT, 2010 WL 989937, at *2-3 (N.D. Ga. Feb. 16, 2010) (Atlanta airport); United States v. Irving, No. S3 03 CR.0633 (LAK), 2003 WL 22127913, at *2-4 (S.D.N.Y. Sept. 15, 2003) (Dallas-Fort Worth Airport). Some, but not all, of these cases found the interview non-custodial because it fell within whatever border questioning safe harbor the relevant circuit had fashioned. Many engaged in the ordinary totality of the circumstances analysis required by Miranda, and a number involved questioning that was focused on criminal wrongdoing, in addition to or instead of, admissibility-related questioning.

analysis applied in any other setting. See, e.g., Howes, 132 S. Ct. at 1188 (rejecting such a per se rule, holding that "imprisonment alone is not enough to create a custodial situation within the meaning of Miranda[,]" and directing that "[w]hen a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation").[4] If an interview inside a prison is not per se custodial, neither, a fortiori, is one in a customs screening area.

20. The location of the interview—in a relatively large interview room with a large window-like opening and an open door, with the defendant positioned closest to the door—weighs in favor of finding that the interview was noncustodial. The bare fact that it occurred in a customs inspection area does not vary that conclusion.

21. The Length of the Interview. Third, the length of the interrogation weighs in favor of finding that the interview was non-custodial. By the highest estimate, the interview lasted approximately two hours. "Courts have found interrogations lasting anywhere from one and one-half hours to seven hours to be non-custodial . . . ." United States v. Killingsworth, 118 Fed. Appx. 649, 651-52 (3d Cir. 2004) (unpublished); see also Yarborough, 541 U.S. at 656 (two

---

[4] See also United States v. Gojah, 553 Fed. Appx. 159, 161-62 (3d Cir. 2014) (unpublished) (an inmate was not in custody when interviewed by an ICE agent in a prison interrogation room); Burkholder v. Newton, 116 Fed. Appx. 358, 361 (3d Cir. 2004) (unpublished) ("Just because [the defendant] was in prison does not mean he was in a custodial setting."); United States v. Conley, 779 F.2d 970, 973 (4th Cir. 1985) ("Miranda warnings are not required prior to all prisoner interrogations, but only when there is a 'change in the surroundings of the prisoner which results in an added imposition on his freedom of movement.'" (quoting Cervantes v. Walker, 589 F.2d 424, 428 (9th Cir.1978)); Leviston v. Black, 843 F.2d 302, 304 (8th Cir. 1988) ("incarceration does not ipso facto render an interrogation custodial"); United States v. Scalf, 725 F.2d 1272 (10th Cir. 1984); Garcia v. Singletary, 13 F.3d 1487 (11th Cir. 1994); Bruce, 439 F. Supp. 2d at 371 ("Because restraint on freedom is the status quo of a prisoner, the courts examine the totality of the circumstances surrounding the interrogation to ascertain whether the defendant should be deemed 'in custody' for purposes of Miranda.").

hours); Beckwith, 425 U.S. at 342–45 (three hours); King, 604 F.3d at 138 ("several hours"); United States v. Wolk, 337 F.3d 997, 1006–07 (8th Cir. 2003) (an hour and twenty minutes); United States v. Czichray, 378 F.3d 822, 825 (8th Cir. 2004) (seven hours); Leese, 176 F.3d at 744–45 (one hour); United States v. Jones, No. 11–261, 2011 WL 4011406, at *3 (E.D. Pa. September 8, 2011) (Schiller, J.) (nine hours); United States v. McKinney, 695 F. Supp. 2d 182, 191 (E.D. Pa. 2010) (agents' search in defendant's house lasted five hours, with questioning separated by as much as three hours and lasting between thirty and forty-five minutes).

22.     The agents did not delay or extend the interview.  Instead, they asked the questions they had for the defendant, served him with grand jury subpoenas, and released him.  The interview's duration, coupled with its efficient administration, weighs in favor of finding that it was not custodial.

23.     <u>The Absence of Coercive Tactics and Physical Restraints</u>.  Fourth, the absence of coercive tactics or physical restraints weighs in favor of finding that the interview was non-custodial.  The interview was a cooperative and friendly "gentlemen's interview."  The defendant answered questions voluntarily and was at no time forced or in any way physically restrained.  The agents did not use a threatening tone or demeanor.  No agent engaged in the interview was in uniform or displayed a weapon (although, per CBP policy, Officer Segui, who was in uniform with a visible weapon, came and went during the interview but did not participate).  The defendant was unrestrained and positioned closest to the door, which was open, without agents blocking his egress.  The defendant was not denied a request for water or to make a phone call.  Courts have found interviews to be non-custodial even when conducted with more aggressive or coercive tactics.  See, e.g., Leese, 176 F.3d at 743 (finding that an interview conducted by two agents, one of them visibly armed and using an aggressive and intimidating

14

tone and demeanor, in closed room was non-custodial, where, among other facts, agent told defendant she would not be arrested that day). Accordingly, this factor weighs in favor of finding that the interview of the defendant was non-custodial.

24. <u>The Defendant's Voluntary Submission to Questioning and Release</u>. Fifth, the defendant's voluntary submission to questioning and release at the end of the interview weigh in favor of finding that it was noncustodial. The defendant voluntarily submitted to questioning. At the conclusion of the interview, moreover, the defendant stated he was willing to be contacted in the future, which indicates that his cooperation with the interview persisted through its completion. Similarly, the fact that the defendant was released at the conclusion of the interview weighs in favor of finding the interview non-custodial. See <u>Howes</u>, 132 S. Ct. at 1189 (listing "the release of the interviewee at the end of the questioning" as a factor relevant to the custody analysis) (citation omitted).

25. Thus, applying all of the factors outlined by the Third Circuit and the Supreme Court, the Court finds that the February 26, 2010, interview was non-custodial. Accordingly, the agents conducting the interview were constitutionally permitted to ask the defendant questions without first administering him <u>Miranda</u> warnings.

**D.     The Court Declines to Determine Whether the <u>Kiam</u> Exception Applies to the Facts of this Case**

26. The government has contended that "the questions asked of the defendant here during his interview may all relate to his admissibility," and so may fall within <u>Kiam</u>'s carve-out. (Opposition at 7 n.3.) Because the Court has found that the February 26, 2010, interview of the

defendant was non-custodial under Miranda, it need not and does not reach the more difficult question of whether the interview falls within the Kiam admissibility questioning carve-out.

                                  Respectfully submitted,

                                  ZANE DAVID MEMEGER
                                  UNITED STATES ATTORNEY


                                */s/ Michelle L. Morgan*
                                MICHELLE L. MORGAN
                                Assistant United States Attorney


                                ANDREW WEISSMANN
                                Chief, Fraud Section
                                Criminal Division, U.S. Department of Justice

                                */s/ Jason D. Linder*
                                JASON D. LINDER
                                Senior Trial Attorney, Fraud Section
                                Criminal Division, U.S. Department of Justice

## **CERTIFICATE OF SERVICE**

      I certify that on this day I caused a copy of the government's response in opposition to the defendant's motion to suppress to be served by ECF filing on:

Stephen R. LaCheen
1429 Walnut Street, 13th Floor
Philadelphia, PA 19102 US


Ian Comisky, Esq.
Blank Rome LLP
One Logan Square
Philadelphia, PA 19103


                                              */s/ Jason D. Linder*
                                              JASON D. LINDER
                                              Senior Trial Attorney, Fraud Section
                                              Criminal Division, U.S. Department of Justice


Date:   February 29, 2016