IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No. 15-1 |
| | : | |
| DMITRIJ HARDER | : | |
| | : | |

**Diamond, J.,**                                                                                      **April 15, 2016**

## MEMORANDUM

Upon his return to the United States from abroad, Defendant Dmitrij Harder—a Russian national and U.S. lawful permanent resident—was questioned in New York's Kennedy Airport by federal agents. Subsequently charged with participating in an international bribery scheme, Harder has moved to suppress his statements, arguing that the agents failed to provide him with <u>Miranda</u> warnings. (Doc. No. 38.) The Government responds that warnings were unnecessary because Defendant was not "in custody," and that <u>Miranda</u> requirements are relaxed during border questioning. (Doc. Nos. 56, 75, 96.) I will deny Defendant's Motion.

## PROCEDURAL HISTORY

On January 6, 2015, the grand jury returned a fourteen-count Indictment, charging Defendant with conspiracy to violate the Foreign Corrupt Practices and Travel Acts, substantive violations of the FCPA and Travel Act, conspiracy to commit international money laundering, substantive violations of the international money laundering statute, and aiding and abetting. (Doc. No. 1, Cts. 1-14); 18 U.S.C. § 371; 15 U.S.C. § 78dd-2; 18 U.S.C. § 1952; 18 U.S.C. § 1956(h), (a)(2)(A); 18 U.S.C. § 2. The grand jury returned a Superseding Indictment on December 15, 2015 with the same counts and several wording changes. (Doc. No. 62.) The Government alleges that from 2007 to 2009, Defendant conspired to pay and conceal some $3.5 million in bribes to Tatjana

Sanderson, the sister of European Bank of Reconstruction and Development officer Andrej Ryjenko.  These payments, which Defendant funneled through Chestnut Consulting Group (his company), were intended to obtain EBRD business and favorable EBRD treatment for two of Defendant's Russian clients:  Irkustsk Oil and Gas Company and Vostok Energy.

On October 16, 2015, Defendant filed the instant Motion to Suppress.  (Doc. No. 38.)  On December 10, 2015, I held a suppression hearing at which the Government called FBI Agent Michael DiCaprio and Immigration and Customs Enforcement Agent Peter Angelino.  (Doc. No. 74, Suppress. Hr'g Tr. at 8-77 (DiCaprio), 78-90 (Angelino).)  The Government also introduced photographs and a drawing of the secondary inspection area at JFK Airport.  (Gov. Exs. 1-4.)  Defendant called his wife, Sophia Moskalenko, and Customs and Border Protection Officer Hermanio Segui.  (Tr. at 95-101 (Moskalenko), 102-107 (Segui).)  He also introduced photographs of the secondary inspection area, cell phone records, and related exhibits.  (Def. Exs. 1-8.)  The Parties stipulated to the testimony of Port Authority Detective Shawn Russell.  (Tr. at 107:13-108:11; Def. Ex. 9.)  Both sides have submitted Proposed Findings of Fact and Conclusions of Law, and Responses.  (Doc. Nos. 75, 76, 95, 96.)

On March 1, 2016, Defendant filed a second Suppression Motion, which I denied after an evidentiary hearing on March 21, 2016.  During that hearing, I announced that I would deny the instant Motion and issue findings and conclusions.  See Fed. R. Crim. P. 12(d).

## FACTUAL FINDINGS

I credit the testimony of Agents DiCaprio and Angelino, that of Officer Segui, and the stipulated testimony of Detective Russell.  I partially credit the testimony of Defendant's wife. I find that the Government has proven the following facts by a preponderance of the evidence.

**I.      Defendant's Arrival at JFK Airport**

On February 26, 2010, Defendant—a lawful permanent resident (i.e., a "green card" holder)—returned to the United States from a ten-day business trip to London, Baku, and Moscow. (Doc. No. 38 at 3; FBI-302, Def. Ex. 2; Tr. at 10.)  After his flight landed in Kennedy Airport at approximately 5:28 p.m., Defendant proceeded to primary customs inspection. (Tr. at 10:6-15, 92:18-21; Def. Ex. 7.)  The previous day, the FBI's Philadelphia Field Office had learned that Defendant—whom that Office suspected of participating in an EBRD bribery scheme—would be arriving at JFK on the 26th. (Tr. at 8-9, 29, 44-45.)  The FBI had also learned that Ryjenko and Sanderson had been arrested by the City of London Police for participating in the EBRD scheme. (Id. at 72:10-15; FBI-302 at 5.)  Agent DiCaprio was assigned to interview Defendant when he arrived at JFK, and to serve him with three grand jury subpoenas. (Tr. at 45:3-8, 47:12-16; FBI-302 at 6.)  DiCaprio was stationed at Kennedy Airport and had no knowledge of the EBRD investigation. (Id. at 8:11-19, 25:1-12.)  Rather, he was a member of the FBI's Joint Terrorism Task Force. (Id. at 8:20-9:3.)

DiCaprio had previously interviewed some fifty to one hundred travelers "transiting in and out of JFK." (Id. at 8:16-9:9.)  When Defendant arrived at the Airport's primary inspection area, CBP officers escorted him (without any physical restraint) to a large waiting room in the secondary inspection area—a "large open area with seating around the perimeter." (Id. at 10:16-25, 11:7-12:21; Gov. Ex. 1; Def. Ex. 4.)

At 6:07 p.m., while Defendant waited, Agent DiCaprio received an email from the Philadelphia Office with a list of questions to ask Defendant. (Def. Ex. 1.)  The questions were organized under the following headings: "Immigration," "Chestnut Consulting," "Property," "Travel," "Overseas Financing Projects," "Search Media Devices," and "Arrest." (Id.)

3

## II.     Defendant's Interview

Defendant waited briefly in the secondary inspection area, when CBP officers called his name and escorted him (again, without physical restraint) to an interview room.  (Id. at 12:23-13:9.)  Defendant sent a text message to his wife at 6:20 p.m., just before the interview began.  (Id. at 99:16-20; Def. Ex. 8.)  The secondary inspection area has three "small," "constricted" rooms, where interviews are customarily conducted.  (Tr. at 13:13-20.)  Agent DiCaprio chose a larger "open space" "office area" for Defendant's interview.  (Id. at 13:13-14:9.)  The area measured approximately 12 by 12 feet, with a large, window-like opening allowing occupants to see into the "high-traffic" hallway and those in the hallway to see inside.  (Id. at 18:18-19:1, 20:10-15; Gov. Exs. 2-4; Def. Ex. 4.)  DiCaprio accurately described the area as "not very private."  (Tr. at 20:15; id. at 22:18 ("It's a busy airport.").)  An ordinary office space with chairs, a desk, and a copy machine, the area was not equipped with a handcuff bar or any other means of restraint.  (Tr. at 20:2-4.)

Four officers were present:  Agents DiCaprio and Angelino, Officer Segui, and Detective Russell.  (Id. at 20:17-20; FBI-302 at 1.)  DiCaprio, Angelino, and Russell were in plainclothes and did not display their weapons.  (Id. at 21:11-23.)  Officer Segui was in uniform with a visible, holstered firearm, but did not participate in the interview.  (Id. at 21:24-22:17.)  Agents DiCaprio and Angelino sat across from Defendant at the desk in the middle of the room, while Detective Russell stood leaning on the nearby countertop of the large, window-like opening.  (Id. at 20:24-21:9.)  Defendant, who was not restrained, sat closest to the door, which remained open throughout.  (Id. at 20:5-7, 21:6-9, 23:24-24:2, 27:23-28:9.)  Although Officer Segui was positioned by the door, he was likely "in and out" of the room, addressing other matters.  (Id. at 21:8-9, 22:12-23.)

4

At the outset, the Agents made it apparent that Defendant was not obligated to speak with them.  The Agents identified themselves, told Defendant that they had a few questions for him, and asked "if he would take the time to speak with us."  (Id. at 23:9-14.)  Agent Angelino credibly testified that Defendant could have refused to answer questions.  (Id. at 81:19-21.)  Defendant was cooperative and agreed to participate in this "gentlemen's interview," which was "very friendly" and "cordial."  (Id. at 23:9, 24:5-19.)  Defendant was "very cooperative, friendly."  (Id. at 24:18.)  Food, water, and restroom facilities were available, had Defendant requested them.  (Id. at 25:18-22.)  The Agents did not know if Defendant had violated any laws.  (Id. at 25:1-5.)  The Agents did not tell Defendant that he was under arrest.  (Id. at 23:21-23.)  Defendant phoned his wife and spoke with her during the interview.  (Id. at 84:9-17, 85:11-18, 99:23-100:12.)   Had Defendant told the Agents he did not want to answer any more questions, the Agents would have ended the interview and escorted him out of the secondary inspection area.  (See id. at 63:1-7; 81:19-21.)

The Agents credibly explained that they did not inform Defendant of his Miranda rights because they did not believe Defendant was in custody.  Agent DiCaprio testified as follows: "[O]ur approach is, this is a cordial interview.  It is not a custodial interview.  And so Miranda warnings were not [provided]."  (Id. at 51:16-19.)  Agent Angelino testified similarly.  (Id. at 81:10 ("[I]t's not a custodial interview.").)

The interview took some two hours, which is the "average" length of such interviews.  (Id. at 26:1-6.)  Agent DiCaprio asked almost all the questions; Agent Angelino "might have asked one or two."  (Id. at 24:13-15.)  The Agents spoke in normal tones of voice.  (Id. at 24:3-25, 42:3-6, 69:21-23.)

Although the Philadelphia FBI Office had suggested that Agent DiCaprio ask Defendant almost one hundred questions, it is apparent that he did not do so, and did not address each of

5

seven subject headings I have set out. DiCaprio's report ("FBI Form 302") confirms that his interview of Defendant was far more abbreviated than that proposed by the Philadelphia Office. DiCaprio—who knew nothing about the underlying EBRD investigation—apparently received the email with the proposed questions on his Blackberry, and attempted to read the questions to Defendant from that handheld device. (Id. at 25:1-7, 39:23-40:7.) Given the Agents' ignorance of the underlying investigation, it is not surprising that they apparently asked few, if any, follow-up questions.

Defendant was asked about his immigration status, contact information, and marital status. (FBI-302 at 1.) He was asked about his dealings with EBRD, how Chestnut is compensated for working on EBRD projects, and how EBRD made wire transfer payments to Chestnut's bank accounts. (Id. at 3-4) The Agents asked Defendant to describe his current international projects, including financing he had sought from EBRD. (Id.) Defendant named the EBRD employees with whom he was working, including Ryjenko and several others. (Id. at 4.) He was asked about Sanderson, whom Defendant described as one of Chestnut's "producing agents." (Id. at 5.) Defendant said that he had wire transferred some $1 million to Sanderson to set up a mortgage brokering company. (Id. at 5.) In response to their questions, Defendant told the Agents that he did not know that Ryjenko and Sanderson had been arrested or that Sanderson was Ryjenko's sister. (Id.)

Defendant never asked to leave or end the interview; rather, he voluntarily answered all the Agents' questions. (Id. at 1-6; Tr. at 24:5-25.) At the interview's conclusion, Defendant accepted service of three grand jury subpoenas in his capacity as Chestnut's custodian of records. (FBI-302 at 6.) Defendant told the Agents he would be willing to speak with them again, and left the Airport. (Id.; Tr. at 27:18-21.)

**CONCLUSIONS OF LAW**

This case turns on the sometimes conflicting authority governing custodial interrogation and border control. Accordingly, I must briefly discuss that authority.

**I.     Miranda Requirements**

For some fifty years, police have been required to inform suspects of certain constitutional rights before interrogating them. See Miranda v. Arizona, 384 U.S. 436, 444-45 (1966). "The rule of *Miranda* applies if two requirements are met: a defendant must be (1) 'in custody' and (2) subject to 'interrogation' by the Government." United States v. Dupree, 617 F.3d 724, 731 n.7 (3d Cir. 2010); see United States v. Ambrose, 668 F.3d 943, 954 (7th Cir. 2012) ("The *Miranda* Court recognized that the inherently coercive nature of custodial interrogation could blur the line between voluntary and involuntary statements, and that the prophylactic measures were necessary to protect the constitutional right [against self-incrimination]."). Courts have extensively defined "custody" and "interrogation."

"'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." Howes v. Fields, 132 S. Ct. 1181, 1189 (2012). In determining whether such a danger is present, the court must examine all the circumstances and ask "'would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" Yarborough v. Alvarado, 541 U.S. 652, 663 (2004) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)); see California v. Beheler, 463 U.S. 1121, 1123-25 (1983); Oregon v. Mathiason, 429 U.S. 492, 495 (1977); United States v. King, 604 F.3d 125, 138 (3d Cir. 2010). If those circumstances objectively indicate that "'there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest,'" then the suspect was "in custody." Id.;

7

J.D.B. v. N. Carolina, 131 S. Ct. 2394, 2402 (2011); cf. Howes, 132 S. Ct. at 1188 ("*Miranda* did not even establish that police questioning of a suspect at the station house is always custodial.").

"Once a person is determined to be in custody, the second inquiry considers whether he was subjected to interrogation." Ambrose, 668 F.3d at 955. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980); United States v. Brownlee, 454 F.3d 131, 146 (3d Cir. 2006).

## II.     Border Control

An alien seeking admission to this country must "convince a border inspector of his or her admissibility to the country by affirmative evidence." United States v. Kiam, 432 F.3d 524, 529 (3d Cir. 2006); see 8 C.F.R. § 235.1(f)(1) ("Each alien seeking admission at a United States port-of-entry . . . must establish to the satisfaction of the inspecting officer that the alien is not subject to removal under the immigration laws."). This burden of persuasion also applies to lawful permanent residents—like Defendant—who seek to reenter the United States. See 8 U.S.C. § 1101(a)(13)(C)(iii), (v) (a lawful permanent resident "shall not be regarded as seeking an admission . . . *unless the alien*," inter alia, "(iii) has engaged in illegal activity after having departed the United States" or "(v) has committed an offense identified in section 1182(a)(2) [listing various criminal grounds for admissibility]") (emphasis added); Gonzaga-Ortega v. Holder, 736 F.3d 795, 799 (9th Cir. 2013) ("[B]order officers were permitted to treat [the petitioner, who had been granted LPR status,] as an applicant for admission based on their conclusion that [he] had engaged in illegal activity, without waiting for a final administrative determination."); see also Guerrero v.

Att'y Gen. of U.S., 515 F. App'x 146, 148-49 (3d Cir. 2013); Doe v. Att'y Gen. of U.S., 659 F.3d 266, 272-73 (3d Cir. 2011).

Because a noncitizen seeking entry must convince the Government of his admissibility, he "does *not* have a right to remain silent." United States v. Gupta, 183 F.3d 615, 617 (7th Cir. 1999). Rather, the Government "is entitled to condition entry on the willingness to provide essential information. No information, no entry." Id. ("Refusing to extend the boon of entry to those who remain silent can be seen as 'compulsion' in the sense that it is a (potentially steep) price tag for remaining silent, yet the government's right to insist on information as a condition of entry cannot reasonably be denied.").

### III.     Miranda's Applicability at the Border

Although Miranda requirements are generally well-settled, they are "a mismatch for the immigration process, at least at the outset." Id. Accordingly, "many courts," including the Third Circuit, "have held that persons seeking entry at the border may be questioned without *Miranda* warnings, even though they are also subject to custody." Id. at 618 (citing cases); United States v. Molina-Gomez, 781 F.3d 13, 22 (1st Cir. 2015) ("[E]vents which might be enough to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into [t]he country." (quoting United States v. Moya, 74 F.3d 1117, 1120 (11th Cir. 1996))); cf. United States v. FNU LNU, 653 F.3d 144, 148 n.3 (2d Cir. 2011) ("The international arrivals section and Customs area of a U.S. airport undisputedly constitute the 'border' for constitutional purposes.").

These "relaxed" Miranda requirements have given rise to considerable uncertainty and litigation. See Molina-Gomez, 781 F.3d at 22 ("[T]he rules surrounding *Miranda* at the border are more relaxed."). The Third Circuit sought to end this uncertainty in United States v. Kiam, 432

9

F.3d 524 (3d Cir. 2006).  There, the police questioned the defendant at the border, without providing Miranda warnings.  Id. at 526-27.  The questions related principally to the defendant's involvement in human smuggling.  Id.  Kiam sought suppression of his unwarned statements.  Id. at 527-28.  Although the trial court agreed that warnings should have been provided, the Circuit did not.  Id. at 528.   Because the "Government never seriously contested that it held Kiam in custody," the Circuit addressed only whether he had been subject to "interrogation," thus triggering Miranda.  Id. at 529-30; United States v. Kiam, 343 F. Supp. 2d 398, 404 (E.D. Pa. 2004) (District Court opinion).  In addressing the "interrogation" criteria, the Court clarified that during border questioning, Miranda warnings are required "[i]f the inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead *only* further a potential criminal prosecution."  Kiam, 432 F.3d at 530 (emphasis added); see United States v. St. Vallier, 404 F. App'x 651, 657 (3d Cir. 2010) ("[Q]uestions that bear upon both admissibility and criminal conduct, while not relating solely to prosecution of the latter, do not cross the boundary we articulated in Kiam.").

In deciding Defendant's Motion, I thus must first determine if Defendant was in custody while being questioned at JFK.  See United States v. Willaman, 437 F.3d 354, 359 (3d Cir. 2006) ("*Miranda*, of course, requires warnings only when the person the police are questioning is in custody.").  If he was, I must then determine whether the questioning was an "interrogation" under Kiam.

**IV.    Custody**

The Government argues vigorously that because Defendant was not in custody, Miranda warnings were not required.  (Doc. Nos. 56, 75, 96.)  I agree.

A custody determination turns on the following factors:

(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

King, 604 F.3d at 138 (quoting Willaman, 437 F.3d at 359-60). The Supreme Court has held that "the release of the interviewee at the end of the questioning" also suggests that the interview was not custodial. Howe, 132 S. Ct. at 1189.

Both the Kiam and St. Vallier Courts based their rulings in part on the observation that most border questioning involves some degree of custody. See Kiam, 432 F.3d at 529-30; St. Vallier, 404 F. App'x at 656. In the instant case, however, the King factors confirm that Defendant was not "in custody" when the Agents questioned him. On the contrary, the totality of the circumstances confirms that a reasonable person in Defendant's position would have felt free to terminate the interview. See Yarborough, 541 U.S. at 663; Thompson, 516 U.S. at 112.

No one told Defendant that he was under arrest or that he was not free to leave. Although Defendant argues that the Third Circuit "requires an affirmative statement to the defendant that he was free to leave," this in fact is incorrect. (Doc. No. 95 at 10 (citing United States v. Leese, 176 F.3d 740 (3d Cir. 1999).) Rather, the Leese Court held the opposite: "'[S]omething must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so.'" Leese, 176 F.3d at 743 (quoting Steigler v. Anderson, 496 F.2d 793, 799 (3d Cir. 1974)).

Here, as I have found, the Agents asked Defendant if he would answer their questions. Defendant could have refused and terminated the interview. Nothing the Agents said or did

11

suggested anything else. Indeed, given that the Agents did not know if Defendant—a lawful permanent resident—had violated the law, they had no basis to detain him further.

As I have also found, Defendant was never restrained. The Agents conducted a "gentleman's interview," neither raising their voices nor addressing Defendant in a hostile manner. FNU LNU, 653 F.3d at 154 ("That one expects both constraints and questions—and that, at least initially, every traveler in the airport must submit to the same sort of questioning while not free to leave—reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest."). The interview was "cordial," and Defendant was friendly and cooperative, voluntarily answering the questions he was asked. King, 604 F.3d at 138 (considering, *inter alia*, "whether the suspect voluntarily submitted to questioning").

The Agents questioned Defendant in an ordinary office with a desk and chairs, not in a holding cell or interrogation room. United States v. Irving, 2003 WL 22127913, at *3 (S.D.N.Y. 2003) (denying suppression where the airport interview room "was an ordinary office with desks, chairs, phones and computers rather than a location with cells or other facilities indicative of a detention function"). Defendant sat closest to an open door that led to a "high-traffic" hallway. Although Officer Segui—who did not ask questions and was not present throughout—was in uniform with a visible weapon, the interviewing Agents were in plain clothes without displayed firearms. United States v. Morgan, 562 F. App'x 123, 130 (3d Cir.) (finding no custody during two-hour interview during which officers were not hostile or aggressive, did not display weapons, and room had unblocked exits), cert. denied, 135 S. Ct. 153 (2014). Moreover, at the interview's conclusion, Defendant volunteered to speak to the Agents again, and left the Airport. Howe, 132 S. Ct. at 1189.

Finally, a "cordial" two-hour discussion that Defendant was free to terminate at any time was not coercively lengthy. See, e.g., Morgan, 562 F. App'x at 130 ("Despite the two-hour length of the interview, a reasonable person in [the defendant's] position would have felt able to end the questioning and leave."); United States v. Killingsworth, 118 F. App'x 649, 651-52 (3d Cir. 2004) ("[C]ourts have found interrogations lasting anywhere from one and one-half to seven hours to be non-custodial."); United States v. Bassignani, 575 F.3d 879, 884 (9th Cir. 2009) (questioning was noncustodial because "nearly the entire two and a half hour interview was conducted in an open, friendly tone. [The defendant] participated actively. The conversation was plainly consensual. . . . [T]he questioning was not confrontational."); see also United States v. Griffin, 922 F.2d 1343, 1348 (8th Cir. 1990) ("The length of the interrogation has been a similarly undeterminative factor in the analysis of custody.").

Although border questioning often involves some degree of custody, that was not the case here. Because Defendant was not in custody during his questioning, Miranda warnings were not required.

**V.      Interrogation**

In the alternative, I conclude that even if I assume, *arguendo*, that Defendant was in custody when questioned at JFK, warnings were not required because the Agents' questions did not "cross the boundary . . . articulated in Kiam." St. Vallier, 404 F. App'x at 657.

Once again, the Kiam Court held that Miranda warnings are required "[i]f the inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead *only* further a potential criminal prosecution." Kiam 432 F.3d at 530 (emphasis added). Remarkably, in quoting this sentence, Defendant omitted the word "only." (Doc. No. 95 at 3 ("[I]f an interrogation's purpose is to 'further a potential criminal prosecution,' Miranda applies.").) This

13

is particularly misleading because it suggests that the Kiam Court prohibited all border questioning intended to aid a criminal prosecution. It did not.

The questions the Agents posed obviously furthered the instant prosecution; presumably that is why Defendant seeks their suppression. I cannot reasonably conclude, however, that the questions "objectively cease[d] to have a bearing on the grounds for admissibility." Kiam 432 F.3d at 530. The Agents sought information relating to Defendant's involvement in various offenses, including money laundering. See 18 U.S.C. §§ 1956, 1957. The Immigration and Nationality Act explicitly provides that any alien who "the Attorney General knows, or has reason to believe, has engaged, is engaging, or seeks to enter the United States to engage, in an offense which is described in section 1956 or 1957 of title 18 (relating to the laundering of monetary instruments)," or who knowingly conspires with others to commit such an offense, "is inadmissible." 8 U.S.C. § 1182(a)(2)(I). The Act also bars admission of any alien "who admits having committed . . . a crime involving moral turpitude . . . or an attempt or conspiracy to commit such a crime." Id. § 1182(a)(2)(A)(i)(I). A crime requiring proof of a "corrupt scienter"—such as a violation of the Foreign Corrupt Practices Act—is likely one "involving moral turpitude." See, e.g., Partyka v. Att'y Gen. of U.S., 417 F.3d 408, 413 (3d Cir. 2005) (observing that "'corrupt scienter is the touchstone of moral turpitude'" (quoting Michel v. INS, 206 F.3d 253, 263 (2d Cir. 2000))); Okabe v. INS, 671 F.2d 863, 865 (5th Cir. 1982) ("Offering a bribe under [18 U.S.C. § 201(b)(3)] is a crime involving moral turpitude, for a corrupt mind is an essential element of the offense."); 15 U.S.C. § 78dd-2(h)(3) (defining the term "knowing" with respect to conduct proscribed by the FCPA).

Once again, these provisions apply with equal force to lawful permanent residents seeking entry—like Defendant. 8 U.S.C. § 1101(a)(13)(C)(iii), (v) (a lawful permanent resident "shall not

be regarded as seeking admission . . . *unless the alien*," inter alia "(iii) has engaged in illegal activity after having departed the United States" or "(v) has committed an offense identified in section 1182(a)(2) of this title [listing various criminal and related grounds for inadmissibility]") (emphasis added); cf. Gonzaga-Ortega, 736 F.3d at 799 (lawful permanent resident is properly regarded by CBP officers as alien seeking admission under § 1101(a)(13)(C)(iii)); Varughese v. Holder, 629 F.3d 272, 275 (2d Cir. 2010) ("Because [the petitioner's] money laundering conviction renders [LPR] ineligible for admissibility to the United States, he is similarly ineligible for adjustment of status.").

In these circumstances, the Agents' questions certainly related to Defendant's admissibility. Moreover, warnings were not required even if Defendant's "questioning went beyond 'routine' admissibility inquiries." Kiam, 432 F.3d at 528. Nor was Miranda triggered because the questions also related to a pending criminal investigation. As the Kiam Court explained: "the mere overlap of the admissibility questioning with the elements of [a defendant's] criminal liability is not fatal." Id. at 530 n.6 ("For example, if an alien admits . . . he is smuggling drugs into the country, *it might be improper* . . . to proceed to question the alien, without *Miranda*, regarding the weight, purchase, and plans for, the drugs he is smuggling.") (emphasis added); St. Vallier, 404 F. App'x at 657 ("[Q]uestions that bear upon both admissibility and criminal conduct, while not relating solely to prosecution of the latter, do not cross the boundary we articulated in Kiam.").

Defendant argues that the Agents' questions did not have a bearing on his admissibility "because the interrogating officer admitted he was not interested in [his] immigration status." (Doc. No. 95 at 4 (citing Tr. at 57:18-23.).) Defendant thus ignores that, as "the Supreme Court has emphasized repeatedly, the inquiry in *Miranda* cases is not into the officer's subjective intent,

15

suspicion, or views." Kiam, 432 F.3d at 528 (citing, *inter alia*, Stansbury v. California, 511 U.S. 318, 324 (1994)). Rather, the Kiam Court explicitly held that Miranda warnings are required only if the agents' questions "*objectively* cease to have a bearing on the grounds for admissibility." Id. at 530 (emphasis added); see St. Vallier, 404 F. App'x at 657 (reiterating Kiam's rejection of a subjective intent standard).

St. Vallier controls here. The Third Circuit there upheld the border questioning (without warnings) and luggage search of the defendant (a returning American citizen), even though both were obviously intended to further the Government's ongoing drug smuggling investigation. St. Vallier, 404 F. App'x at 655-56, 656 n.4, 657. The Court reasoned that the questioning and the search were permissible because, under an objective standard, both bore on the admissibility of the defendant and his luggage. Id. at 656-58.

In the instant case, regardless of the Agents' subjective intent, their questions certainly had a bearing on Defendant's admissibility and did not "*only* further a potential criminal prosecution." Kiam, 432 F.3d at 530 (emphasis added). Accordingly, Miranda warnings were not required.

## CONCLUSION

In sum, Defendant believes that suppression is required under Kiam because, regardless of whether he was in custody, the Agents' questions were designed to aid the instant prosecution. This reading of Kiam is simply wrong. It would impose more rigorous Miranda standards on the questioning of those seeking admission to this country than on the questioning of everyone already within our borders—exactly the opposite of the Kiam Court's intentions. See id. at 531 ("We do not disagree with the holdings of any of our sister Circuits, who have as a functional matter upheld almost all pre-*Miranda* questioning during border detentions."). Because Defendant was not "in custody" during the Airport questioning, Miranda warnings were not required. In the alternative,

16

I conclude that warnings were not required because under Kiam, the Agents' questions did not trigger Miranda.  Accordingly, I will deny Defendant's Motion to Suppress.

An appropriate Order follows.

*/s/ Paul S. Diamond*

April 15, 2016                                        Paul S. Diamond, J.